IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARK ANTHONY SCOTT,

      Plaintiff,                      No. 2:08-cv-0117 LKK JFM (PC)

    vs.

HAILE BETHLEHEM, et al.,

      Defendants.              FINDINGS & RECOMMENDATIONS

_____/

        Plaintiff is a state prison inmate proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. On March 13, 2008, plaintiff filed a verified Second Amended Complaint. By order filed March 10, 2009, defendant Galloway's motion to dismiss was granted. This action is proceeding on plaintiff's claims that Drs. Haile and Saukhla were deliberately indifferent to plaintiff's serious medical needs. (See January 29, 2009 Findings and Recommendations at 6.)

                              FACTS AND PROCEDURAL BACKGROUND

        On June 12, 2007, a CMF nurse mistakenly administered to plaintiff Pentamidine, a medication that was intended for another inmate with the same last name as plaintiff. Plaintiff claims he suffered a skin rash condition caused by the Pentamidine. Plaintiff alleges that defendants Bethlehem Haile, M.D. (Dr. Haile) and Narinder Saukhla, M.D. (Dr. Saukhla) were

deliberately indifferent to plaintiff's serious needs because (1) Dr. Haile stopped plaintiff's HIV medications without plaintiff's consent; (2) Dr. Saukhla stopped plaintiff's medication for Hydrochlorothiazide; and (3) Dr. Saukhla tried to cover up the nurse's mistake by attempting to change plaintiff's Dapsone prescription to Pentamidine, knowing plaintiff had mistakenly received Pentamidine and had an allergic reaction to it.

## UNDISPUTED FACTS

1. On June 12, 2007, a CMF nurse mistakenly administered Pentamidine to plaintiff, a medication that was intended for another inmate with the same last name as plaintiff.

2. Dapsone is an oral medication used to prevent a pneumonia called Pneumocystis, also known as PCP, in patients with a low T-cell count. Its side effects are blood dyscrasias, peripheral neuropathy and, in rare cases, serious skin reaction such as toxic epidermal necrolysis. (Saukhla Decl., ¶ 4.)

3. Pentamidine is another medication used to prevent PCP. This is an inhaled medication given once a month through an instrument called a Hand Held Nebulizer (HHN). Its primary side effects are chest pain, rash, wheezing and pancreatitis. (Saukhla Decl., ¶ 5.)

4. Albuterol is a medication used to open up the breathing tubes in patients with Asthma. It is also administered through an HHN. Its side effects vary, but mainly consist of chest pain, arrhythmias, skin reaction like angio edema, and hypoglycemia. Albuterol and Pentamidine treatments are typically administered for 20-25 minutes. (Saukhla Decl., ¶ 6.)

5. On March 14, 2007, plaintiff's skin was "very dry." (Saukhla Decl., ¶ 7(1) and Ex. A at 79.)

6. On March 29, 2007, plaintiff had "dry skin." (Saukhla Decl., ¶ 7(2) and Ex. A at 78.)

7. On April 24, 2007, plaintiff had a dark rash in the left popliteal fossa, the area behind his left knee. (Saukhla Decl., ¶ 7(3) and Ex. A at 77.)

/////

8. On June 11, 2007, plaintiff submitted a Health Care Services Request complaining of "very bad . . . uncontrollable skin reaction due to [his] medications, itching all over [his] body." (Saukhla Decl., ¶ 7(4) and Ex. A at 62; Pl.'s Opp'n at 15; Ex. 1.)

9. On that Health Care Services Request form, a Registered Nurse noted plaintiff "has multiple papules (tiny and scattered) all over body. Denies taking any Hydroxygen. STOPPED taking all meds including HIV meds for fear that he's allergic to one of them." (Saukhla Decl., ¶ 7(4) and Ex. A at 62; Pl.'s Opp'n at 15; Ex. 1.) The RN's notes are dated June 13, 2007. (Id.)

10. Dr. Saukhla did not see or treat plaintiff on June 11, 2007. (Saukhla Decl., ¶ 7(4).)

11. On June 12, 2007, a Health Care Services Request form was completed. (Pl.'s Ex. 3.) Plaintiff complained that he had received the wrong medication. (Id.) The triage RN noted plaintiff was anxious and scared, but his oxygen saturation rate was 98% and no adverse effects were noted. (Id.) Plaintiff was referred to Dr. Long. (Id.)

On June 12, 2007, Dr. Long completed interdisciplinary progress notes that noted plaintiff "took Albuterol today by accident." (Saukhla Decl., ¶ 7(5); Ex. A at 69.) Dr. Long noted that plaintiff had the "usual side effects of Albuterol but no other problem." (Id.) Plaintiff's prescription for HIV medications was also renewed. (Id.) Plaintiff was "seen and released without signs or symptoms." (Pl.'s Opp'n at 15.)

12. Dr. Saukhla did not see or treat plaintiff on June 12, 2007. (Saukhla Decl., ¶ 7(5).)

13. On June 14, 2007, plaintiff left the clinic without being seen because the wait was too long. (Saukhla Decl., ¶ 7(6) and Ex. A at 67; Pl.'s Ex. 1, 5.)

14. On June 16, 2007, plaintiff saw Dr. Bethlehem Haile for chest pain and his HIV medications were renewed. Plaintiff did not complain of skin rashes. (Saukhla Decl., ¶ 7(7) and Ex. A at 64-66; 22.; Pl.'s Ex. 6)

15. On June 19, 2007, plaintiff submitted a Health Care Services Request which states in relevant part: "[Inmate] refuses to take HIV [medications], stating 'they trying to kill me.'" (Saukhla Decl., ¶ 7(8) and Ex. A at 63; Pl.'s Ex. 18.)

16. On June 20, 2007, plaintiff complained of "itching all over his body with . . . rash. . . . Said has stopped taking all his meds." (Pl.'s Ex. 7; Defts.' Ex. A at 61.) Plaintiff was seen by Dr. Haile who, with plaintiff's consent, stopped Azithromycin and Hydrochlorothiazide medications with the thought that these medications were probably causing plaintiff's skin rashes. (Saukhla Decl., ¶ 7(9) and Ex. A at 22, 61; see Declaration of Bethlehem Haile, M.D. (Haile Decl.) at ¶ 5; Pl.'s Ex. 7.)

17. On July 2, 2007, plaintiff visited Dr. Saukhla in the clinic for his skin rash condition. This was the first time Dr. Saukhla saw or treated plaintiff since the accidental medication incident on June12, 2007. Plaintiff stated to Dr. Saukhla that his skin rash was improving. Dr. Saukhla noted that plaintiff's skin rash was resolving since he stopped two medications, Azithromycin and Hydrochlorothiazide. Plaintiff "restarted HIV meds after brief nonadherence." At plaintiff's request, Dr. Saukhla prescribed Selenium Sulfide shampoo to help his skin rash. (Saukhla Decl., ¶ 7(10) and Ex. A at 60, 20; Pl.'s Ex. 8.)

18. On July 10, 2007, plaintiff was seen by Dr. Hsuey, complaining of coughing. Plaintiff did not complain of skin rashes. (Saukhla Decl., ¶ 7(11) and Ex. A at 58-59.)

19. On July 17, 2007, plaintiff visited Dr. Saukhla in the clinic. Plaintiff was very hostile that day; he was not answering Dr. Saukhla's questions, he claimed that his skin rash was caused by wrong medicine being given on June 12, 2007, and he insisted on being referred to a dermatologist. Plaintiff had dry rash on his back, chest, legs and face. Dr. Saukhla suggested to plaintiff that Dapsone could be the cause of his skin rash. Plaintiff stated he had not been taking Dapsone for the past two months. Dr. Saukhla referred plaintiff to dermatology. (Saukhla Decl., ¶ 7(12) and Ex. A at 57; Pl.'s Ex. 9.)

/////

20. On July 19, 2007, plaintiff submitted a Health Care Services Request, complaining of rashes on his upper torso and was seen by RN Champen. Plaintiff's Selenium Sulfide shampoo was discontinued. (Saukhla Decl., ¶ 7(13) and Ex. A at 55-56, 17.)

21. On July 25, 2007, Dr. Saukhla saw plaintiff in the clinic. Plaintiff was apologetic for his behavior on his last visit and explained to Dr. Saukhla that he had not been taking his HIV medications on his own accord since July 20, 2007. Consequently, Dr. Saukhla decided to stop his HIV medications officially on July 25, 2007. Plaintiff had dry skin on his face and the rash on extremities and torso was fading away. Dr. Saukhla suggested that plaintiff stop all medications, including Dapsone, and switch to Pentamidine. Plaintiff did not want to take Pentamidine because his rash was fading. Dr. Saukhla stopped all medications and prescribed medications which plaintiff agreed to take, including oral steroids, mineral oil for his skin and Nizoral shampoo for his scalp. (Saukhla Decl., ¶ 7(14) and Ex. A at 53,15; Haile Decl., ¶ 6 and Ex. A at 12, 50, 51, 53; Pl.'s Ex. 10.)

22. On August 2, 2007, plaintiff was seen by Dr. Hsuey in response to the prior dermatology referral. Plaintiff was diagnosed with a "pruritic rash." Dr. Hsuey prescribed antihistamines, Zantac and steriod cream. (Saukhla Decl., ¶ 7(15) and Ex. A at 52, 13-14.)

23. On August 6, 2007, Dr. Saukhla saw plaintiff in the clinic. Plaintiff's skin rash was now completely resolved. Plaintiff had quit all medications briefly but needed to be on a PCP medication. Plaintiff would restart medications one at a time, including Dapsone immediately. (Saukhla Decl., ¶ 7(16) and Ex. A at 51, 12.)

24. On August 16, 2007, Dr. Saukhla saw plaintiff in the clinic. Plaintiff's rash was gone, but his skin was dry where the rash had been. Dr. Saukhla re-started plaintiff's HIV medications and noted that if the rash recurred, plaintiff's medications would have to be switched completely. (Saukhla Decl., ¶ 7(17) and Ex. A at 50, 12.)

25. At all relevant times, Dr. Saukhla was a physician and surgeon employed by the CDCR. Dr. Saukhla has been a licensed practicing physician since 1995, and has been

employed by CDCR as a physician and surgeon since 1999. He is Board Certified in Internal Medicine. At all relevant times, his duty was to provide medical care to HIV infected inmates at CMF. (Saukhla Decl., ¶ 2.)

26. Dr. Saukhla was plaintiff's primary care physician from May 15, 2007, to approximately June of 2008. During that time, Dr. Saukhla provided medical treatment to plaintiff as his primary care physician as well as his HIV care provider. Dr. Saukhla relied on plaintiff's medical chart when treating the skin rash condition alleged in the second amended complaint ("SAC"). (Saukhla Decl., ¶ 7.)

27. Pentamidine is commonly prescribed for HIV patients. In his experience, Dr. Saukhla has never had a patient with an allergic reaction to Pentamidine. Although an allergic reaction to Pentamidine is possible, it is Dr. Saukhla's medical opinion that plaintiff did not suffer an allergic reaction to Pentamidine in this case because he had skin rashes prior to June 12, 2007, and because he received brief exposure to Pentamidine. Regardless of the cause of his skin rash, Dr. Saukhla provided prompt and adequate treatment to plaintiff at all times and was never deliberately indifferent to his medical needs. (Saukhla Decl., ¶ 16.)

28. Dr. Haile is a licensed practicing physician employed by the CDCR as a physician. At all relevant times, Dr. Haile was a physician employed by CDCR. Her primary duty was to provide medical care and treatment to inmates at CMF. (Haile Decl., ¶ 2.)

29. Dr. Haile was not plaintiff's primary care physician during the times alleged in the SAC. (Haile Decl., ¶ 4.)

30. Contrary to his allegations, on June 16, 2007, plaintiff did not have difficulty breathing due to an allergic reaction caused by a combination of medications he had taken, Dapsone and Penamidine, and he did not complain of skin rashes. Plaintiff was evaluated and discharged, and on the same day his HIV medication was renewed for 30 days. (Haile Decl., ¶ 4 and Ex. A at 21, 22, 64, 65-66.)

/////

1    31. At no time did Dr. Haile discontinue plaintiff's HIV medications.  (Haile

2 Decl., ¶¶ 4-6 and Ex. A at 12, 21, 22, 50, 51, 53, 62, 64; see Saukhla Decl. at ¶ 7.)

3 SUMMARY JUDGMENT STANDARDS UNDER RULE 56

4    Summary judgment is appropriate when it is demonstrated that there exists "no

5 genuine issue as to any material fact and that the moving party is entitled to a judgment as a

6 matter of law."  Fed. R. Civ. P. 56(c).

7    Under summary judgment practice, the moving party

8    always bears the initial responsibility of informing the district court
     of the basis for its motion, and identifying those portions of "the
9    pleadings, depositions, answers to interrogatories, and admissions
     on file, together with the affidavits, if any," which it believes
10   demonstrate the absence of a genuine issue of material fact.

11 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

12 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

13 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

14 to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

15 after adequate time for discovery and upon motion, against a party who fails to make a showing

16 sufficient to establish the existence of an element essential to that party's case, and on which that

17 party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

18 concerning an essential element of the nonmoving party's case necessarily renders all other facts

19 immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

20 whatever is before the district court demonstrates that the standard for entry of summary

21 judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

22    If the moving party meets its initial responsibility, the burden then shifts to the

23 opposing party to establish that a genuine issue as to any material fact actually does exist.  See

24 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

25 establish the existence of this factual dispute, the opposing party may not rely upon the

26 allegations or denials of its pleadings but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 US. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken

/////

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On May 30, 2008, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

## ANALYSIS

In order to prevail on his Eighth Amendment claim plaintiff must prove that he had a "serious medical need" and that defendants acted with "deliberate indifference" to that need. Estelle v. Gamble, 429 U.S. 97, 105 (1976). A medical need is serious if "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992) (quoting Estelle, 429 U.S. at 104). Deliberate indifference is proved by evidence that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Mere negligence is insufficient for Eighth Amendment liability. Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

Whether a defendant had requisite knowledge of a substantial risk is a question of fact and a fact finder may conclude that a defendant knew of a substantial risk based on the fact that the risk was obvious. Farmer, 511 U.S. at 842. While the obviousness of the risk is not conclusive, a defendant cannot escape liability if the evidence shows that the defendant merely refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true. Id. Deliberate indifference specifically to medical needs "may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003).

1    "Prison officials are deliberately indifferent to a prisoner's serious medical needs
2 when they deny, delay, or intentionally interfere with medical treatment." Hallett v. Morgan, 296
3 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted).  Additionally, "a
4 plaintiff's showing of nothing more than 'a difference of medical opinion' as to the need to
5 pursue one course of treatment over another [is] insufficient, as a matter of law, to establish
6 deliberate indifference." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (as amended)
7 (1996).  In order to prevail on a claim involving choices between alternative courses of treatment,
8 a plaintiff must show that the course of treatment the doctors chose was medically unacceptable
9 under the circumstances and that they chose this course in conscious disregard of an excessive
10 risk to the plaintiff's health.  See Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir.2004);
11 Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996) (citing Farmer, 551 U.S. at 837), cert.
12 denied, 519 U.S. 1029 (1996).

13    As noted above, the medical records do not support plaintiff's allegations that Dr.
14 Haile stopped plaintiff's HIV medications without plaintiff's consent.  Rather, the medical
15 records reflect plaintiff stopped taking his HIV medications on his own because plaintiff thought
16 they were causing his rash.  (Pl.'s Opp'n at 15, Exs. 1; 7.)  Plaintiff has provided no evidence that
17 the brief periods he was not taking his HIV medications harmed him in any way.  The records
18 also reflect that Dr. Saukhla appropriately noted that plaintiff needed to be on a PCP medication,
19 and ordered plaintiff to restart his medications, one at a time, on August 6, 2007.  (Saukhla Decl.,
20 ¶ 7(16) and Ex. A at 51, 12.)

21    The medical records demonstrate that Dr. Haile, not Dr. Saukhla, stopped
22 plaintiff's medication for Hydrochlorothiazide because Dr. Haile believed, after discussion with
23 plaintiff, that the Hyrochlorothiazide might be causing the rash.  (Pl.'s Ex. 7; SAC at 23.)
24 Indeed, the records confirm that plaintiff's rash abated once plaintiff stopped taking
25 Azithromycin and Hydrochlorothiazide.  (Pl.'s Ex. 8.)
26 /////

Finally, the medical records refute plaintiff's theory that Dr. Saukhla tried to cover up the nurse's mistake by attempting to change plaintiff's Dapsone prescription to Pentamidine, knowing plaintiff had mistakenly received Pentamidine and had an allergic reaction to it. Rather, Dr. Long mistakenly noted in plaintiff's chart that plaintiff had been accidentally medicated with Albuterol, not Pentamidine. (Pl.'s Ex. 3.) Dr. Saukhla relied on the medical record reflecting plaintiff had been treated with Albuterol in his subsequent treatment of plaintiff. (Saukhla Decl., ¶¶ 9-16, Ex. A at 57, 62, 69, 77-79.) Dr. Saukhla avers that he was unaware that plaintiff had been accidentally dosed with Pentamidine until he was served with the SAC in June of 2008. (Saukhla Decl., ¶ 10.) Plaintiff has provided no evidence to the contrary.

Dr. Saukhla considered prescribing Pentamidine for plaintiff on July 17, 2007 "because [he] thought Dapsone was causing plaintiff's skin allergy." (Saukhla Decl., ¶ 13.) However, plaintiff informed Dr. Saukhla at that time that plaintiff had not been taking Dapsone for two months. (Id.) Dr. Saukhla avers that at no time did he actually prescribe Pentamidine for plaintiff. (Saukhla Decl., ¶ 15.) None of the medical records provided demonstrate otherwise.

Review of the medical records in this case reflects that plaintiff suffered from a rash prior to the accidental administration of medication on June 12, 2007, and that plaintiff received follow-up care on numerous occasions while doctors attempted to diagnose and treat the rash. Plaintiff has provided no evidence that suggests either Dr. Haile or Dr. Saukhla were deliberately indifferent to plaintiff's serious medical needs. Both doctors have provided declarations confirming that they provided plaintiff all reasonable and necessary care consistent with community standards as well as CDCR policies and procedures. (Saukhla Decl., ¶¶ 17-18; Haile Decl., ¶¶ 7-8.) Plaintiff has provided no evidence to the contrary. Thus, defendants are entitled to summary judgment.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' October 16, 2009 motion for summary judgment be granted; and
2. This action be dismissed.

1    These findings and recommendations are submitted to the United States District
2 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty
3 days after being served with these findings and recommendations, any party may file written
4 objections with the court and serve a copy on all parties.  Such a document should be captioned
5 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that
6 failure to file objections within the specified time may waive the right to appeal the District
7 Court's order.  <u>Martinez v. Ylst</u>, 95 1 F.2d 1153 (9th Cir. 1991).
8 DATED:  November 11, 2009.

_____
UNITED STATES MAGISTRATE JUDGE

12   /001; scot0117.msj